UNITED STATES, Appellee

v.

John C. HARRIS, Airman First Class
U.S. Air Force, Appellant

No. 04-0238

Crim. App. No. 34918

United States Court of Appeals for the Armed Forces

Argued December 7, 2004

Decided September 2, 2005

BAKER, J., delivered the opinion of the Court, in which GIERKE, C.J., and EFFRON and ERDMANN, JJ., joined. CRAWFORD, J., filed a dissenting opinion.


Counsel


For Appellant: Captain Martin L. Powell (argued); Colonel Beverly B. Knott, Lieutenant Colonel Carlos L. McDade, and Major Terry L. McElyea (on brief).

For Appellee: Captain Kevin P. Stiens (argued); Colonel Gary F. Spencer, Lieutenant Colonel Robert V. Combs, and Major John C. Johnson (on brief).

Military Judge:  Gregory E. Pavlik


THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION

United States v. Harris, No. 04-0238/AF

Judge BAKER delivered the opinion of the Court.

Appellant was tried by members at a general court-martial. In accordance with his pleas, he was convicted of three specifications of writing bad checks with the intent to defraud in violation of Article 123a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 923a (2000). Contrary to his pleas, he was convicted of unauthorized absence and larceny[1] in violation of Articles 86 and 121, UCMJ, 10 U.S.C. §§ 886, 921 (2000), respectively. The adjudged and approved sentence provided for a dishonorable discharge, confinement for two years, forfeiture of all pay and allowances and reduction to grade E-1. The United States Air Force Court of Criminal Appeals affirmed the findings and sentence in a short-form per curiam opinion. United States v. Harris, No. ACM 34918 (A.F. Ct. Crim. App. Dec. 5, 2003).

The issue before us is whether Appellant's petition for new trial should be granted based on newly discovered evidence of Appellant's lack of mental responsibility. For the reasons that follow, the petition is granted as to the contested offenses. Further, and for different reasons, we conclude that Appellant's pleas of guilty must be set aside.

---

[1] Although Appellant's plea to wrongful appropriation was accepted by the military judge, the Government proceeded on the greater offense and Appellant was ultimately convicted of larceny.

BACKGROUND

Appellant was a twenty-year-old E-3 at the time of the offenses.  On or about October 19, 2000, he wrote two bad checks to a Ford dealership in Clovis, New Mexico, in the course of purchasing a new truck.  The checks totaled $10,000.00.[2] Appellant then drove the truck from Cannon Air Force Base (AFB) in New Mexico to Lynn, Indiana, to visit his family without obtaining authority to leave his command.  After Appellant arrived in Lynn, his father, who testified later at a post-trial session, became concerned because it seemed his son had traveled a great distance for a relatively short weekend visit.  He was also concerned that his son seemed unable to remain in one place for any appreciable time during this short visit.  For instance, the father later testified that over the weekend period from Friday to Sunday, his son had traveled from New Mexico to Indiana and only visited with him for about thirty to forty-five minutes before driving another two-and-a-half hours to see his brother.  Following this five-hour round-trip, he then made a five-hour drive to another part of the state.  According to the father, the following Thursday he received a call from Appellant who indicated he was upset about the situation that he had gotten himself into and expressed some thoughts of suicide. His

---

[2] Earlier, on or about October 17, 2000, Appellant had negotiated an additional check to an establishment called "The Buckle" that was ultimately dishonored.

father subsequently contacted his unit and arranged to have him picked up by local law enforcement authorities for subsequent return to military custody.  While awaiting ultimate return to his command, Appellant was detained at the confinement facility at Scott AFB.  There, authorities apparently observed Appellant acting strangely.  There was testimony at the post-trial session that Appellant was observed sitting on the floor of his cell polishing it with his sock.

Prior to trial, Appellant's defense counsel learned that before joining the military, Appellant had received psychological counseling.  As a result, counsel requested a sanity board convened under Rule for Courts-Martial (R.C.M.) 706 on November 1, 2000.  On November 8, 2000, the convening authority detailed Major (MAJ) Pfeiffer, a clinical psychologist, to conduct the evaluation.  On November 9, 2000, MAJ Pfeiffer concluded that Appellant did not suffer from any mental defect and that he "is mentally responsible for his behavior."

Following his subsequent conviction, and during his confinement at the Naval Confinement Facility in Miramar, California, Appellant was evaluated a second time by a U.S. Navy psychiatrist, Lieutenant (LT) LaCroix.  During his initial intake, Appellant was sent to see LT LaCroix because according to her, the confinement facility's policy was to refer for

4

psychiatric assessment any prisoner who had been previously prescribed psychiatric medication.  Prior to his arrival at the facility Appellant had been placed on a prescription for medication to treat depression.  During this initial assessment, LT LaCroix learned that Appellant had experienced repeated episodes of depression and mania since age fifteen and that his mother had been diagnosed with a bipolar disorder.  She also learned that leading up to the days of the offenses, Appellant had exhibited a number of symptoms such as grandiosity, sleep disruption and unusual goal-directed activity.  Following the assessment, LT LaCroix diagnosed Appellant as suffering from a Bipolar Type I disorder, prescribed additional medication to treat his condition, and met with him one or two times a month to assess his progress.

As part of Appellant's clemency submissions, trial defense counsel submitted an affidavit from LT LaCroix detailing her diagnosis.  Based upon her determination that Appellant "was not able to control his actions or appreciate the wrongfulness of his conduct due to psychiatric symptoms [at the time of the offenses]," trial defense counsel requested that the convening authority grant a new trial or, in the alternative, disapprove the adjudged dishonorable discharge.  Instead, the convening authority ordered a post-trial session pursuant to Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2000).  According to the

5

convening authority's memorandum to the military judge, the stated purpose of the session was "to inquire into a matter which has arisen post-trial . . . which may substantially affect the legal sufficiency of your findings of guilty." The memorandum further defined the scope of the session as "a limited inquiry to determine whether the accused's pleas of guilty were provident and should have been accepted" in light of LT LaCroix's diagnosis and conclusions.[3]

The Article 39(a) session was conducted on June 14, 2001. After hearing testimony from MAJ Pfeiffer, LT LaCroix and others, the military judge issued findings of fact and concluded that at the time of the offenses, Appellant suffered from "a bipolar disorder that would equate to a severe mental disease or defect," but that he appreciated the wrongfulness of his actions and was subsequently competent to stand trial. The military judge concluded that the pleas were provident, but suggested that the convening authority take into account Appellant's illness when considering clemency.

After receipt of the military judge's findings and conclusions, the convening authority ordered a second sanity

---

[3] The parties do not agree on whether the convening authority's action was limited to having the military judge reconsider the accused's guilty pleas, or whether this action is also appropriately cast as an inquiry into the necessity for a new trial under R.C.M. 1210, in light of the "newly discovered" evidence of Appellant's illness. We need not resolve this dispute, as we have before us Appellant's petition for a new trial, which we review de novo. However, the evidence considered at the post-trial session is, of course, relevant to our analysis.

board be convened.  Appellant was evaluated this time by Captain

(CAPT) Ho, a Navy psychiatrist, who concluded that at the time

of the offenses, Appellant suffered from a severe mental

disease, i.e., bipolar disorder.  CAPT Ho, however, concluded

that Appellant "was able to appreciate the nature and quality or

wrongfulness of his conduct."  On January, 16, 2002, the

convening authority denied Appellant clemency and approved the

sentence as adjudged.

During review in the court below, Appellant raised several

issues.  But he did not raise the issue of a new trial in light

of newly discovered evidence.  Rather, he argued that his

sentence was inappropriately severe in light of his mental

health.  As a result, he requested that the court order a

rehearing on sentence or reassess the sentence in light of post-

trial developments.  The lower court subsequently affirmed the

findings and sentence without discussion, noting only that the

issues raised by Appellant were without merit.

Appellant subsequently filed a petition for review before

this Court as well as a separate petition for a new trial

pursuant to Article 73, UCMJ, 10 U.S.C. § 873 (2000), based on

newly discovered evidence of lack of mental responsibility.  In

his supplement to the petition for grant of review Appellant

assigned two issues, one of which asserted that he deserved a

new trial because he suffered from a severe mental disease at the time of the offenses.[4]

## DISCUSSION

A.  The Petition for New Trial

Petitions for new trials are disfavored in the law; relief is granted only to avoid a "manifest injustice."  United States v. Williams, 37 M.J. 352, 356 (C.M.A. 1993).  R.C.M. 1210(f)(2) provides granularity to this standard, stating that a new trial shall not be granted on the grounds of newly discovered evidence unless the petition demonstrates that:

> (A) The evidence was discovered after the trial;
>
> (B) The evidence is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence; and
>
> (C) The newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused.

In this case, the parties agree that the evidence of Appellant's mental illness was discovered after trial.  However, the parties do not agree as to whether Appellant exercised due diligence in discovering the evidence prior to trial.

---

[4] The issue granted on Appellant's petition for review is:

> WHETHER APPELLANT SHOULD BE GRANTED A NEW TRIAL BECAUSE HE SUFFERED FROM A SEVERE MENTAL DISEASE AT THE TIME OF HIS OFFENSES THAT RENDERED HIM UNABLE TO APPRECIATE THE NATURE AND QUALITY OR THE WRONFULNESS OF HIS ACTIONS.

As noted, on January 15, 2004, Appellant also submitted a petition for new trial pursuant to Article 73 based on this same issue.

The Government argues that Appellant failed to disclose pertinent information to MAJ Pfeiffer, who conducted the pretrial sanity board, namely Appellant's prior psychological counseling, disclosed by Appellant's father at the post-trial session, and evidence of the mental health issues of Appellant's parents. According to the Government, had Appellant been forthcoming, his true mental state would have been discovered prior to trial. However, this argument assumes that a person with a severe mental defect will have the savvy to know what information the trained mental health professional needs to evaluate him as well as the wherewithal to consciously choose to withhold such information. Moreover, previously, this Court has applied the due diligence standard in the rule to the efforts of defense counsel. United States v. Fisiorek, 43 M.J. 244, 248 (C.A.A.F. 1995); Williams, 37 M.J. at 357. Therefore, on the record before this Court we conclude that counsel exercised the requisite due diligence by requesting the initial sanity board prior to trial.

We turn now to the third prong of analysis. In context, the question is whether LT LaCroix's diagnosis and the testimony at the Article 39(a) session would have had an impact on the

trial result.  However, the parties disagree on the applicable substantive measure.[5]

The Government avers that the standard is stated clearly in the rule, which provides that a new trial shall not be ordered unless "the newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused."  R.C.M. 1210(f)(2)(C).  Appellant's contrasting argument is that a new trial must be granted where the request is based upon post-trial discovery of a severe mental disorder unless "the court is convinced beyond a reasonable doubt that a different result would not occur had the court been aware of the new evidence."  Emphasis added.  Appellant argues that this standard pertains whether he is before this Court on direct appeal pursuant to Article 67, or whether he is petitioning this Court under Article 73.  Appellant further argues that "[h]istorically. . . we have given preferential treatment to the question of mental responsibility of a military member, even though the matter was not litigated at trial."  United States v. Young, 43 M.J. 196, 197 (C.A.A.F. 1995).  Appellant also notes that this Court has applied a reasonable doubt standard in other contexts

---

[5] Identification of the correct substantive standard before this Court is complicated because the parties' arguments are addressed to both Appellant's petition for direct review under Article 67, UCMJ, 10 U.S.C. § 867 (2000), and his petition for new trial under Article 73.  However, for the reasons

involving new evidence of mental responsibility.  See United States v. Van Tassel, 38 M.J. 91 (C.M.A. 1993); United States v. Dock, 28 M.J. 117, 120 (C.M.A. 1989); United States v. Lilly, 25 M.J. 403 (C.M.A. 1988).

This reasonable doubt standard has its genesis in United States v. Triplett, 21 C.M.A. 497 (1972).  Triplett was convicted at a trial before a military judge of the murder of a fellow soldier.  At trial, the parties litigated the accused's mental responsibility at the time of the killing.  A psychiatrist, who examined the accused prior to trial testified that in his opinion the accused was suffering from a psychotic episode at the time of the offense that was self-induced by the accused's voluntary drug use.  Finding the accused mentally responsible beyond a reasonable doubt, the military judge found the accused guilty as charged.  Id. at 498-99.  While the case was pending review before the Court of Military Review, Triplett was evaluated by a sanity board that concluded that at the time of the offense, he suffered an acute psychosis that rendered him unable to distinguish right from wrong.  A subsequent review by the Surgeon General concurred with the sanity board.  Id. at 499-501.

---

stated below, in either appellate context we reach the same conclusion applying R.C.M. 1210(f).

Relying on paragraph 124 of the 1969 revised edition of the Manual for Courts-Martial (MCM),[6] the lower court held after reviewing the record as a whole "that no reasonable doubt exists as to the sanity of the accused." Triplett, 21 C.M.A. at 502. Affirming the Court of Military Review, this Court construed the language and purpose of paragraph 124, and stated, "If on the record, as a whole, the tribunal concludes 'that a reasonable doubt exists as to the sanity of the accused,' it should set aside the findings of guilty and dismiss the charge." Id. at 503 (citation omitted). In those instances when reasonable minds might differ as to the weight of the new and the old evidence, the Court stated, the question is "whether, considering all the matter on the issue, a different verdict might reasonably result if the issue was again presented to a court-martial." Id. This

---

[6] Paragraph 124 states: ACTION BY CONVENING OR HIGHER AUTHORITY. After consideration of the record as a whole, if it appears to the convening authority or appropriate higher authority that a reasonable doubt exists as to the sanity of the accused, the findings of guilty affected by that doubt should be disapproved . . . ." MCM (1969 revised ed.), ¶124 (emphasis added).

Court framed the question in like manner in Dock,[7] Van Tassel,[8]
and Lilly.[9]

However, as in Triplett, these cases arose in the context
of appeals taken from decisions by the lower courts on the issue
of later-discovered evidence of a lack of mental responsibility.
As a result, the trial court or courts of criminal appeals were
required to apply a beyond a reasonable doubt standard with
respect to guilt.  Because an accused now has the burden of
demonstrating lack of mental responsibility by clear and
convincing evidence, this results in what is an admittedly
convoluted appellate standard of review as set out in United
States v. Cosner:

> Is the appellate court convinced beyond a reasonable doubt
> that reasonable fact finders would not find by clear and
> convincing evidence that, at the time of the offense,
> appellant suffered from "a severe mental disease or defect"
> such as to be "unable to appreciate the nature and quality
> or the wrongfulness of" his acts?

35 M.J. 278, 281 (C.M.A. 1992)(citations and emphasis omitted).

---

[7] "Is the appellate court convinced beyond a reasonable doubt that a different
result would not obtain if the trier of fact had this new evidence before
it?"  28 M.J. at 120.

[8] "The standard to be applied by a Court of Military Review to determine
'whether the issue of insanity was adequately raised . . . post-trial' is
whether 'the appellate court [is] convinced beyond a reasonable doubt that a
different result would not obtain if the trier of fact had this new evidence
before it[.]"  38 M.J. at 95 (quoting Dock, 28 M.J. at 119-20) (emphasis
added).

[9] "Whether the fact finder, after considering all the evidence that would be
available, might have a reasonable doubt as to appellant's mental
responsibility?" 25 M.J. at 408.

13

For the fact-finder, such a demonstration would amount to a reasonable doubt as to guilt.

In addition, Triplett rested on language in paragraph 124 of the 1969 MCM,[10] which expressly included the "beyond a reasonable doubt" standard.  Paragraph 124 was not included in the 1984 MCM; however, the Triplett standard continues in case law.  The Court's discussion in Triplett suggests why:

> The actions [paragraph 124] sanctions demand an analysis of the content, and a weighing of the value, of the new information. Manifestly, consideration of content and weight is required to determine whether, on "the record as a whole," a "reasonable doubt exists" as to the sanity of the accused at the time of the offense.

21 C.M.A. at 502 (emphasis added).  This language contemplates a weighing function carried out by the authorities empowered to do so.  This was borne out later in paragraph 124, which stated that if it is determined that the accused lacks mental capacity, "a conviction may not be approved or affirmed under Articles 64, 65, or 66."[11]  MCM, ¶124 (1969 revised ed.)  Neither paragraph 124 nor the Triplett Court referenced Article 67.

In light of the service courts' fact-finding function, the standard articulated in Triplett, Dock, Van Tassel, and Cosner continues as the appropriate standard for lower courts considering the impact of newly discovered evidence regarding

---

[10] See supra note 6.

14

mental responsibility. In contrast, this Court applies the separate standard set forth in R.C.M. 1210(f)(2)(C) in reviewing requests for new trials on the ground of mental responsibility. The rule sets out the standard in plain text, and there is no ambiguity or anything in the rule that suggests a reasonable doubt standard. Moreover, unlike the lower courts, because we have no fact-finding authority, we are prohibited from weighing evidence in the manner suggested in Cosner and Triplett.

This conclusion is consistent with United States v. Murphy, 50 M.J. 4 (C.A.A.F. 1998). While Murphy's case was pending before the Court of Military Review, he obtained funding from the Judge Advocate General to employ the services of a social history investigator. However, the court completed its review of his case before the investigation could be completed. Id. at 13. After the court's decision in his case, Murphy was examined by a clinical psychologist and three psychiatrists. These mental health professionals severally opined that Murphy suffered from various psychological dysfunctions at the time of the offenses, that he suffered a severe mental defect that rendered him unable to form the requisite intent for premeditated murder, that he was unable to appreciate the nature and quality or the wrongfulness of his acts, and that the prior

---

[11] These provisions reference respectively the post-trial responsibilities of the convening authority, the judge advocates general, and the courts of military review.

15

sanity board was based on inadequate assessment methods. Id. at 13-14. Murphy presented this information for the first time to this Court in the form of affidavits. The two-year limitation in Article 73 for filing petitions for new trials having expired, this Court concluded that Murphy's case could not be resolved pursuant to R.C.M. 1210(f). Murphy, 50 M.J. at 14. We further acknowledged that "[a]lthough there has been some disagreement as to the correct standard of review, there clearly is agreement that, if the requirements of R.C.M. 1210(f)(2) are present, the accused is entitled to a new trial." Murphy, 50 M.J. at 15. However, notwithstanding the temporal inapplicability of R.C.M. 1210(f), we concluded that the standard found in R.C.M. 1210(f)(2)(C) "provides us with a clear rule for testing whether the result obtained in the court-martial proceeding is a reliable result." Murphy, 50 M.J. at 15. But rather than ordering a new trial, we remanded to the lower court to "[r]eview the new evidence to determine if a different verdict as to findings might reasonably result in light of post-trial evidence." Id. at 16. This, of course, is the standard found in Triplett and the remand took into account the situation, like Murphy's, where the discovery of the new evidence occurred after the Court of Criminal Appeals had concluded its review under Article 66, UCMJ, 10 U.S.C. § 866 (2000). In other words, the remand allowed that court to apply

16

its fact-finding authority to the new evidence, an opportunity not previously provided to it.   Thus, as in the case of a timely Article 73 request, Murphy had the benefit of a review before a fact-finding court prior to a review by this Court.

B.  Application

Turning to Appellant's case, we note that he has filed within the statutory period under Article 73.  Unlike the situation in Murphy, we also have before us the record of the post-trial Article 39(a) session where the testimony of the two mental health professionals was tested in the "crucible of examination."  Triplett, 21 C.M.A. at 503.

The question becomes whether the post-trial evidence in Appellant's case "would probably produce a substantially more favorable result for the accused."  R.C.M. 1210(f)(2)(C).  Or, alternatively, is it necessary to remand for further analysis under the reasonable doubt standard applied by the Courts of Criminal Appeals?  At this point, three Government mental health professionals have offered varying conclusions as to Appellant's mental responsibility at the time of the offenses.  Only one of these evaluations was specifically sought by Appellant.  MAJ Pfeiffer concluded that Appellant suffered no severe mental defect or disease.  In contrast, LT LaCroix concluded that he did suffer a severe disease at the time of the offenses and that he was "not able to control his actions or appreciate the

17

wrongfulness of his conduct due to psychiatric symptoms." CAPT Ho concluded that Appellant suffered from a severe mental disease or defect, but he was able to appreciate the nature and quality or wrongfulness of his conduct.

As a threshold, we note that Appellant's defense was immediately impacted by the newly discovered evidence, because defense counsel was unable to prepare and fully develop the affirmative defense of mental responsibility prior to trial because she had no evidence that Appellant suffered from a severe mental defect or disease. More importantly, the distinctions in background and methodology used by the doctors in reaching contradictory conclusions, raises the possibility that a different court-martial might reach a finding more favorable to the Appellant. For example, MAJ Pfeiffer was a clinical psychologist and LT LaCroix a medical doctor. LT LaCroix had experience with "hundreds" of patients diagnosed with bipolar disorders. In addition, LT LaCroix met with Appellant "one to two times a month" for the four months between her initial intake evaluation of him and the date of the post-trial Article 39(a) session. MAJ Pfeiffer spent several hours with Appellant during one visit. Moreover, the military judge was persuaded by LT LaCroix's testimony that Appellant suffered a severe mental disease at the time of the offenses.

Of course, "the mere existence of conflicting opinion does not necessarily require a rehearing." Triplett, 21 C.M.A. at 503. However, this case presents more than conflicting opinions. LT LaCroix testified in detail not only as to her qualifications, which were different than those of MAJ Pfeiffer, but also as to her methodology in obtaining needed information from Appellant. We also note the absence of any "forum shopping" by Appellant for a more favorable opinion than MAJ Pfeiffer's. CAPT Ho's examination was ordered by the convening authority, and LT LaCroix testified that Appellant had not initially sought her out for treatment. In fact, she stated that Appellant was not even aware that he was being sent to a psychiatrist.

In any event, the question for this Court is not whether MAJ Pfeiffer, LT LaCroix, or CAPT Ho reached the correct conclusion, but whether a different court-martial might have reached a result more favorable to the accused in light of arguments defense counsel might have brought to bear with knowledge of Appellant's condition as well as the differences in the testimony of the doctors. In light of the newly discovered evidence regarding Appellant's mental illness, the competing views as to its impact on responsibility, and all other pertinent evidence, we conclude this evidence would probably produce a substantially more favorable result for Appellant on

the contested offenses.  We now address the offenses to which Appellant pleaded guilty.

## C.  Appellant's Guilty Pleas

Appellant was charged with larceny, but entered a plea of guilty to the lesser offense of wrongful appropriation.  He also pleaded guilty to three specifications of writing bad checks with intent to defraud.  Appellant now urges that we apply the new-trial construct of Article 73 and R.C.M. 1210(f) to decide whether Appellant's pleas were provident.  Because R.C.M. 1210 expressly precludes its application to guilty pleas, we decline to do so.[12]

A guilty plea will be rejected only where the record of trial shows a substantial basis in law and fact for questioning the plea.  United States v. Prater, 32 M.J. 433, 436 (C.M.A. 1991); United States v. Jordan, 57 M.J. 236, 238 (C.A.A.F. 2002); United States v. Hardeman, 59 M.J. 389, 391 (C.A.A.F. 2004).  We review de novo the military judge's legal conclusion that Appellant's pleas were provident.

A plea of guilty waives a number of important constitutional rights.  United States v. Care, 18 C.M.A 535, 541-42 (1969).  As a result, the waiver of these rights must be an informed one.  United States v. Hansen, 59 M.J. 410, 413

---

[12] "A petition for a new trial of the facts may not be submitted on the basis of newly discovered evidence when the petitioner was found guilty of the relevant offense pursuant to a guilty plea."  R.C.M. 1210(a).

(C.A.A.F. 2004).  In this case, the military judge concluded after holding an Article 39(a) session that Appellant suffered a severe mental defect or disease at the time of the offenses.[13] We do not see how an accused can make an informed plea without knowledge that he suffered a severe mental disease or defect at the time of the offense.  Nor is it possible for a military judge to conduct the necessary Care inquiry into an accused's pleas without exploring the impact of any potential mental health issues on those pleas.  Thus, we conclude that there is a substantial basis in law and fact to question Appellant's pleas of guilty.

### DECISION

The decision of the United States Air Force Court of Criminal Appeals is set aside, along with the findings and sentence.  Appellant's petition for new trial is granted.[14]  The record of trial is returned to the Judge Advocate General of the Air Force for action consistent with this opinion.

---

[13] At this juncture the military judge had two options.  He could have inquired whether Appellant still wished to plead guilty, now aware of a possible affirmative defense based on mental illness.  Alternatively, the military judge could have advised the convening authority that a substantial basis in law and fact now existed to question whether Appellant's pleas were provident.

[14] Our resolution of Appellant's Petition for New Trial renders the granted issue moot because the same standard articulated in our opinion to resolve the petition for new trial applies as well to the issue when presented to us for the first time on direct review.

United States v. Harris, 04-0238/AF

CRAWFORD, Judge (dissenting):

Lack of mental responsibility can be a valid defense in only one situation, when:

> at the time of the commission of the acts constituting the offense, the accused, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his or her acts.

R.C.M. 916(k)(1).

If Appellant appreciated the "nature and quality or the wrongfulness" of his actions, he does not qualify for this defense. During his providence inquiry, Appellant explained several times that he understood that he had insufficient funds when he stole the truck and wrote the bad checks. His father's testimony during the Article 39(a) session also suggested a motive: emulation of his relatively wealthy brother.

The accused is always presumed to have been mentally responsible and bears the burden of proving, "by clear and convincing evidence, that he or she was not mentally responsible at the time of the alleged offense."[1] R.C.M. 916(k)(3)(A). Even if an accused can prove that he lacked

---

[1] "Clear and convincing evidence is that weight of proof which produces in the mind of the factfinder a firm belief or conviction that the allegations in question are true." United States v. Martin, 56 M.J. 97, 103 (C.A.A.F. 2001) (internal quotation marks and citations omitted), quoted in United States v. Collins, 60 M.J. 261, 265 (C.A.A.F. 2004).

mental responsibility over a long period of time that
included the day of the offense, the prosecution can rebut
this by proving that the accused was mentally responsible
at a specific time during that period -- for example, while
signing checks.  United States v. Martin, 56 M.J. 97
(C.A.A.F. 2001).

The providency hearing made clear the intent behind
Appellant's offense involving the truck:

> ACC:  Your Honor, I was counting on the deal not
> going through.  I thought that the vehicle was
> too much and that the loan wouldn't get approved.
> I believed I was going to have to turn it back in
> at the end of the week.
>
> MJ:  All right.  You said you planned for the
> deal not to go through . . . . [and] you wrote
> them some checks that you knew weren't going to
> go through?
>
> ACC:  Yes, Your Honor . . .
>
> MJ:  [Y]ou knew at that point that you didn't
> have the money in the bank, so you were
> defrauding them.  Is that right?
>
> ACC:  Yes, Your Honor . . .
>
> . . . .
>
> MJ:  And as a result, you were taking [the truck]
> for your own personal use, you said "to show
> off"?
>
> ACC:  Correct, Your Honor.

After Appellant changed his plea on the desertion charge to
not guilty, the military judge returned to the issue of

2

intent during discussion of the uttering specifications.

When the judge asked him why he believed himself guilty of

Specification 1, Appellant replied:

> When I made the check I knew that I, the
> maker thereof, did not or would not have
> sufficient funds in the bank for the payment
> of the check in full . . . .
>
> MJ:  You made this check for $1,090.39. Did
> you know at the time you didn't have that
> money in the bank?
>
> ACC:  Yes, Your Honor . . . .
>
> . . . .
>
> MJ:  You read off the intent to defraud, and
> I defined that earlier for you.  Basically,
> obtaining items through misrepresentation
> and intending to use those items for the use
> and benefit of yourself or the use and
> benefit of someone else.  Is that what you
> did when you presented this check?
>
> ACC:  Yes, Your Honor.

Appellant's accounts of the remaining specifications were

similar.  He admitted that the making of all three of the

bad checks in the additional charge was "wrongful,

unlawful, and with intent to defraud."

Appellant's father, John Cochran Harris, disclosed a

possible motive during his testimony for the defense.

After recounting Appellant's history of problems with

depression, low self-esteem, and lack of discipline, Mr.

Harris went on to describe Appellant's relationship with his older brother:

> A:  His brother has been very successful.
> He was an average student in high school.
> But then upon graduating from high school he
> went to ITT Technical Institute and . . .
> built his way up into some respectable
> earning positions with some companies.  Even
> to the point where he was earning enough
> that he purchased a small private plane to
> learn how to fly . . . . So, that was very
> impressionable [sic] I know to John the fact
> that his brother was earning good money, and
> had a plane, and had a family, and was
> moving ahead.  Even to the point now that my
> oldest son did get his private license; and
> has now sold that plane; and has gone back
> to college full time at Indiana State
> University and enrolled in the professional
> pilot program . . . .
>
> Q:  Do you think that Airman Harris looks up
> to his older brother?
>
> A:  Completely . . . . And there's one thing
> about Chris, my oldest son, was material
> things.  He liked . . . nice things; a good
> car; but he was making the money that he
> could handle those things.  I know John was
> kind of caught up into that materialistic
> image that his brother kind of projected and
> wanted to be like him in that respect.
>
> Q:  And do you think that was part of the
> reason why he did the things that he did in
> this case?
>
> A:  I really think it is.

The testimony of Appellant and his father does not suggest a man who was "unable to appreciate the nature and quality or the wrongfulness of his . . . acts," as required for a

valid defense under R.C.M. 916(k)(1).  Instead, it suggests a man who was mentally ill but nevertheless had a motive, a plan, and the ability to commit several crimes.  Despite any mental illness, Appellant was lucid enough to form the necessary criminal intent.  Thus, the defense of lack of mental responsibility is unavailable to him.

If lack of mental responsibility is a heavy burden for an appellant, a petition for a new trial is even heavier.  This Court generally disfavors such petitions and will grant one "only if a manifest injustice would result absent a new trial . . . based on proffered newly discovered evidence."  United States v. Williams, 37 M.J. 352, 356 (C.M.A. 1993).

The standard for these petitions is laid out in R.C.M. 1210(f), which permits only two grounds for new trials: newly discovered evidence and fraud on the court-martial. Appellant petitions on the basis of newly discovered evidence, which requires him to show all of the following:

> (A) The evidence was discovered after the trial;
>
> (B) The evidence is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence; and
>
> (C) The newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused.

R.C.M. 1210(f)(2).

This Court tends to frown on post-trial second opinions by mental-health experts; it is reluctant to grant an appellant a new trial solely because his search for additional experts has yielded more favorable results.  In United States v. Gray, 51 M.J. 1, 14 (C.A.A.F. 1999), this Court held that "the establishment of conflicting expert opinion on an accused's mental state does not necessarily require a rehearing."  The Gray Court found a rehearing to be particularly unwarranted where evidence of the illness existed before trial and there was a dispute as to the effect of that illness on the defendant at the time of the offense(s).  Id.

This case illustrates the problem with post-trial second opinions.  After his providency hearing, in which he had admitted his intent to steal the truck and pass the bad checks, Appellant sought the help of a psychiatrist.  That doctor, Lieutenant Camille LaCroix, examined him and concluded that he suffered from Bipolar Disorder Type I. In contrast to the deliberate action he had described in his providency hearing, she later testified that:

> [h]e said he had no intention of buying a
> truck; he has no idea why that happened.  He
> knows it did happen because he did do that
> and he had written these checks and

> everything else, but he had no preconceived
> notion of going to do these things.

She added, in response to defense counsel's question, that the fact that Defendant had spent several days at the car dealership before stealing the car was irrelevant; that period could have been merely a build-up to the irresistible impulse that is characteristic of this disorder.  She also noted that people with bipolar disorder cannot appreciate the wrongfulness of their actions at the time of an offense.  Her conclusion thus became key to Appellant's defense, even though it contradicted his own testimony.

Even if we ignore our policy against expert-shopping, Appellant's case fails on another point:  He would have discovered his evidence before trial, had he exercised due diligence.  Appellant himself had struggled with mental illness as a teenager and had received medication and extensive counseling.  He easily could have discovered his family history of mental illness, including his mother's history of bipolar disorder.  Due diligence by the defense also would have brought to light the evidence from Senior Master Sergeant Marilyn Toland and Captain William Cannon, who witnessed his peculiar behavior during pretrial confinement.  Appellant did not discover any of this

available evidence before trial.  He thus is disqualified from consideration for a new trial on the basis of R.C.M. 1210(f)(2)(B) and our own precedent.  Gray, 51 M.J. 1 at 14.

I have no doubt that bipolar disorder has thrown Appellant's life into repeated turmoil, and I underestimate neither his struggle nor the pain it has brought his family.  However, we are asked to judge his actions against the fixed standards set by Congress.  Appellant was able to appreciate the wrongfulness of his acts at the time he committed them.  Therefore, the lack of mental responsibility cannot be a valid defense for him. Moreover, he failed to exercise due diligence in pretrial discovery.  Therefore, his petition for a new trial fails to meet the statutory requirements.  Accordingly, I respectfully dissent.