UNITED STATES of America

v.

Steven G. CARLSON, Gunnery Sergeant
(E–7), U.S. Marine Corps.

NMCCA 200100209.

U.S. Navy–Marine Corps Court
of Criminal Appeals.

Sentence Adjudged 20 May 1999.

30 April 2009.

For Appellant: Frank J. Spinner, Civilian Defense Counsel; Capt Sridhar Kaza, USMC.

For Appellee: Maj E.A. Harvey, USMC.

Before O'TOOLE, Chief Judge, COUCH, Senior Judge, and MAKSYM, Appellate Military Judge.

O'TOOLE, Chief Judge:

A general court-martial, composed of officer and enlisted members, convicted the appellant, contrary to his pleas, of seven specifications of violating a lawful general regulation, violating a lawful order, two specifications of cruelty to subordinates, two specifications of making a false official statement, two specifications of forcible sodomy, six specifications of indecent assault, two specifications of false swearing, indecent exposure, three specifications of indecent language, two specifications of soliciting another to commit an offense, and breaking restriction, in violation of Articles 92, 93, 107, 125, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892, 893, 907, 925, and 934. The members sentenced the appellant to confinement for 15 years, total forfeiture of pay and allowances, reduction to pay grade E–1, and a dishonorable discharge. The convening authority approved the sentence as adjudged and, except for the dishonorable discharge, ordered the sentence executed.

In our prior review, this court set aside the findings of guilty to Charge II and its two supporting specifications (maltreatment of a subordinate), and to Specification 1 (indecent assault), and Specifications 7 and 8 (false swearing) of Charge V, on the basis of multiplicity and unreasonable multiplication of charges. *United States v. Carlson,* No. 200100209, 2006 WL 416238, 2006 CCA LEXIS 27, unpublished op. (N.M.Ct.Crim.App. 14 Feb. 2006). We thereafter reassessed the sentence and found that it remained appropriate, in part because the facts essential to establish the dismissed specifications would still have been relevant to the remaining charges of forcible sodomy and false official statements. As such, those facts would still have been before the members for consideration on sentencing. We affirmed the remaining findings of guilty, and the sentence, as reassessed and approved by the convening authority.

This case is again before the court on the appellant's motion to reconsider, alleging that new evidence shows misconduct by Mr. Phillip Mills, a U.S. Army Criminal Investigation Laboratory (USACIL) chemist who conducted serological testing of evidence in the appellant's case. Prior to considering the substantive merit of the appellant's allegations, we ordered a *DuBay*[1] hearing to inquire into the conduct of Mr. Mills and its relationship to the appellant's case. During this first *DuBay* hearing, a witness from USACIL indicated that the agency was conducting a review of all of Mr. Mills' forensic work.[2] We thereafter directed a second *DuBay* hearing to inquire into the status of the USACIL review, or to make findings based upon it.[3] We have now considered the record of trial, the results of both *DuBay* hearings, the appellant's Brief on Supplemental Issue, the Government's Answer, and the appellant's Reply Brief on Supplemental Issue. We have also considered the final USA-CIL report regarding Mr. Mills' case work, obtained by order of this court.[4]

We conclude that the findings and sentence are correct in law and fact, and that no error materially prejudicial to the substantial rights of the appellant was committed. Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c).

### Background

The appellant was convicted of the forcible sodomy of two fellow Marines in separate incidents in 1997 and 1998. The supplemental error concerns only Charge IV, Specification 2. Those charges relate to Lance Corporal (LCpl) M, who testified at trial and directly implicated the appellant. To corroborate the testimony of LCpl M, the Government introduced forensic evidence that DNA consistent with the appellant was found on LCpl M's underwear and on a swab sample taken from his penis. The underwear had first been examined by Mr. Mills, who conducted serology testing by which he identified amylase, a substance commonly associated with saliva. Mr. Mills cut swatches of the stain and forwarded the evidence to Mr. Delmer Price, also of USA-CIL, who conducted the testing that revealed the DNA. In addition, Mr. Price requested the penile swabs, even though Mr. Mills had not reported finding any amylase on them. Upon testing the swabs, Mr. Price discovered DNA from which he could not exclude the appellant. Both scientists testified at trial about their respective tests.

Following the appellant's conviction in 1999, Mr. Mills advanced within USACIL to become a DNA examiner. In 2005, USACIL published two memoranda providing notice of deficiencies in DNA testing and outlining problems related to Mr. Mills' work as a USACIL Forensic DNA Examiner, including, *inter alia,* cross-contamination of samples and false data entry. First *DuBay*

1. *United States v. DuBay,* 37 C.M.R. 411, 1967 WL 4276 (C.M.A.1967).

2. The first *DuBay* hearing was conducted on 17–18 October 2006. The military judge issued his findings of fact on 6 February 2007.

3. The second *DuBay* hearing was conducted on 18 July 2008. The military judge issued his findings of fact and conclusions of law on 7 August 2008.

4. Our consideration of this document revealed there is nothing that would require material clarification at a third *DuBay* hearing. We then move to dispose of this case.

Hearing Record at 2, Finding of Fact 8. Based on the resulting internal USACIL inquiry, Mr. Mills was removed from his position as a Forensic DNA Examiner, and he resigned in December 2005. First *DuBay* Hearing Record at 3, Finding of Fact 19. These USACIL disclosures served as the basis for the appellant's motion to reconsider. The evidence was then more fully developed at the two *DuBay* hearings ordered by this court, the second of which presented and examined the draft results of an extensive review of Mr. Mill's DNA and serological work from 1995 until his removal.

## Discussion

*Standards of Review*

As already noted, the appellant seeks to have his conviction set aside based on newly discovered evidence of subsequent misconduct by Mr. Mills, the chemist who conducted the serology testing of certain evidence in his case.[5] The procedural mechanism by which the appellant petitioned this court was a motion to reconsider our initial review under Article 66, UCMJ.[6] Once such appellate jurisdiction attaches, a "case moves along a 'time-line' or statutory track, forward but sometimes backward ... until, at some point, a decision becomes final, and no further appeal is available or necessary." *United States v. Johnson*, 45 M.J. 88, 89 (C.A.A.F. 1996) (citation omitted). The appellant's motion was filed within the time permitted for petitioning the Court of Appeals for the Armed Forces (CAAF). Having granted the appellant's motion to reconsider, this case did not advance to consideration by the CAAF, but remained on the statutory track with this court for our further consideration under our Article 66, UCMJ, jurisdiction. As a result, our jurisdiction is not derived from RULE FOR

COURTS-MARTIAL 1210, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2005 ed.). It follows that neither the absence of a petition for a new trial under this rule, nor the expiration of the two-year period for filing such a petition, bar completing our review of this case under Article 66. *United States v. Luke*, 63 M.J. 60, 63 (C.A.A.F.2006)(citing *United States v. Murphy*, 50 M.J. 4, 15–16 (C.A.A.F. 1998)).

■ The court is obligated by Article 66, UCMJ, to address the validity of the findings and sentence of the court-martial. *United States v. Chisholm*, 59 M.J. 151, 152 (C.A.A.F.2003). With respect to "newly discovered" evidence, and notwithstanding the inapplicability of R.C.M. 1210(f) as the jurisdictional basis for review, the CAAF has concluded that the standard found in R.C.M. 1210(f)(2)(C) provides "a clear rule for testing whether the result obtained in the court-martial proceeding is a reliable result." *Murphy*, 50 M.J. at 15; *see United States v. Harris*, 61 M.J. 391, 397 (C.A.A.F.2005). Thus, we will examine the entire record to determine whether:

> [t]he newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused.

*Murphy*, 50 M.J. at 14 (quoting R.C.M. 1210(f)).

In assessing the new evidence, we keep in mind that relief should be granted "only if a manifest injustice would result absent a new trial ... based on proffered newly discovered evidence." *Harris*, 61 M.J. at 400 (citations omitted). Additionally, "new evidence which is 'merely cumulative or impeaching' is not

5. Though not assigned as error in accord with our rules, the appellant also seeks relief for the failure of the Government to provide certain evidence as required by the first *DuBay* judge and by this court, and for excessive post-trial delay. We share the second military judge's concern that USACIL personnel were less than forthcoming, and were not promptly compliant with the rulings of this court or the military judges, all of whom directed disclosure of certain information. In an effort to properly develop the factual record and to ensure that all required information was disclosed, this court ordered personal service on the Commanding General of USACIL,

and a second *DuBay* hearing. Order of 9 Jun 2008. The military judge presiding over the second *DuBay* hearing ensured the disclosure orders were enforced. The evidence sought by the appellant was provided during the second *DuBay* hearing, and the matter is now moot. Second *DuBay* Hearing Record, Finding of Fact 34, n. 3. We will discuss post-trial delay *infra*.

6. The appellant has not petitioned for a new trial under RULE FOR COURTS-MARTIAL 1210, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2005 ed.).

... an adequate basis for the grant of a new trial." *United States v. Thomas,* 11 M.J. 135, 138 (C.M.A.1981)(quoting *Mesarosh v. United States,* 352 U.S. 1, 9, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956)(footnote omitted)). It only becomes an adequate basis for a new trial when it relates directly to a material issue. *United States v. Williams,* 37 M.J. 352, 357 (C.M.A.1993).

In determining what constitutes newly discovered evidence, we will accept the factual findings of the two *DuBay* military judges unless they are clearly erroneous. *United States v. Diaz,* 61 M.J. 594, 602 (N.M.Ct. Crim.App.2005), *aff'd,* 64 M.J. 176 (C.A.A.F. 2006). However, their conclusions of law we review *de novo. United States v. Gallagher,* 66 M.J. 250, 253 (C.A.A.F.2008).

Finally, since this case is being reviewed as a reconsideration of our initial review under Article 66, UCMJ, we are required to conduct a *de novo* review of both the legal and factual sufficiency of a conviction. *United States v. Walters,* 58 M.J. 391, 395 (C.A.A.F.2003) (citations omitted). In the event we conclude the "new" evidence fails to meet the standard articulated for a new trial, we will proceed to our independent determination of whether all of the evidence, taken together, is legally and factually sufficient, and that we are convinced it constitutes proof beyond a reasonable doubt of each required element. *United States v. Washington,* 57 M.J. 394, 399–400 (C.A.A.F.2002); *United States v. Reed,* 51 M.J. 559, 561–62 (N.M.Ct. Crim.App.1999), *aff'd,* 54 M.J. 37 (C.A.A.F. 2000).

*Analysis*

A. Findings of Fact

■ Having reviewed the entire record, including both *DuBay* hearings, we conclude that the first *DuBay* judge's findings of fact are supported by the record. We, therefore, adopt them as our own. We similarly conclude that the findings of fact from the first part of the second *DuBay* judge's findings (1–2, 4–17) are supported by the record. With one exception, we adopt them as well. The exception is Finding of Fact 3, which indicates that Mr. Mills admitted falsifying serology data. We are unable to find any factual support for this finding. It is clearly erroneous, and we decline to adopt it.[7]

We adopt the findings (18, 19) in part two of the second *DuBay* judge's findings. And, in part three, we find evidentiary support for findings 20 through 23, and 25 through 28. We adopt these as summaries of the testimony referenced. Finding of Fact 24 correctly states that Mr. Mills did not perform the DNA analysis in this case. However, the balance of that finding materially misstates the substance of some rather technical testimony. Second *DuBay* Hearing Record at 60–63. As such, the balance of this finding is clearly erroneous, and we decline to adopt it.

We adopt the findings of fact from the second *DuBay* judge's listing of relevant documents. *Id.* at 6–7, Findings 29–34. These are clear and succinct statements of fact as to existing relevant evidence. However, we are unable to discern how the second *DuBay* military judge supplemented the prior judge's findings. *Id.* at 7, Finding of Fact 35.[8] Similarly, we are unable to determine what findings he adopted from among those tendered by the appellant, or to what extent he believes they are consistent with his own. *Id.*[9] As a result, Finding of Fact 35 is rejected as clearly erroneous. Despite the noted

---

7. This finding appears to be an oversight: Mr. Mills admitted to falsifying DNA data, but not serology data. *See* Second *Dubay* Hearing Record, Appellate Exhibit LXXIII at 2 and AE LXXIV at 1.

8. "Findings of fact 18, 28, 29, 31, 33, 34, 48, 40 and 43 ... are specifically supplemented by this court in its findings of fact above." Second *DuBay* Hearing Record at 7, Finding of Fact 35. None of the second *DuBay* military judge's findings cite his predecessor's findings by number, and we are unable to correlate them in this

"catch-all" paragraph without such a reference. The better practice would be to refer by number in a finding to any previous finding to be supplemented.

9. "This court also concurs with the modifications to the findings of fact with regards to those findings listed above that are contained in the defense's proposed findings ... [t]o the extent they may conflict with any findings made herein, the inconsistencies are to be resolved in favor of this court's ruling."

irregularities in some findings, the evidence gathered by the *DuBay* judges is clear.

### B. Additional Background

The undisputed evidence indicates that, at the time the appellant was convicted in May 1999, Mr. Mills only conducted serological exams for USACIL. First *DuBay* Hearing Record at 3–4, Findings of Fact 26, 35. Most importantly, he did not perform the DNA analysis in the appellant's case. *Id.* at 1, Finding of Fact 4. Four years later, after being designated a DNA Forensic Examiner, Mr. Mills was suspended because of a December 2003 incident in which he contaminated evidence during DNA analysis. *Id.* at 2, Finding of Fact 8. He was suspended a second time in May 2005 for falsifying data during DNA analysis, and then falsely reporting his actions. As previously noted, Mr. Mills was removed from his position as a Forensic DNA Examiner and he thereafter resigned. *Id.* at 3, Finding of Fact 19.

Following Mr. Mills' removal, USACIL began a retrospective investigation of Mr. Mills' work, extending back to 1995. *Id.* at 4, Finding of Fact 28; Second *DuBay* Hearing Record at 2–4, Findings of Fact 1–15. The status of that retrospective inquiry was the subject of the second *DuBay* hearing, during which the draft report of investigation was presented. Second *DuBay* Hearing Record at 1, Finding of Fact 1–2; *see* Appellate Exhibit LXXIV. Testimony indicated that the report remained a draft because there was a box of recently located evidentiary samples, which had yet to be reviewed, and which would add to the findings. Second *DuBay* Hearing Record at 4, Findings of Fact 18–19. When it was completed, the final report was submitted for our review by the appellant. Consent Motion to Attach of 7 Oct 2008.

### C. Forensic Evidence and Cross–Contamination

*Misconduct Related to DNA Evidence*

The facts are undisputed that Mr. Mills made errors in DNA examinations, including

at least one instance of cross-contamination, and that he falsified official records of his DNA examinations in 2005. As disturbing as these facts are, Mr. Mills had not yet been certified to conduct DNA analysis in 1999, when the appellant was tried, and he did not conduct the DNA analysis in this case. His later misfeasance and malfeasance in DNA examinations occurred four and six years, respectively, after he conducted the serological examinations in this case.

Mr. Mills' DNA-related conduct, while arguably relevant as impeachment evidence under the broad admissibility provision of MILITARY RULE OF EVIDENCE 104, MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.), is of limited probative value in assessing the accuracy of the serological exam he conducted on the evidence in this case in 1999. His errors and misconduct with DNA analysis involved different, more complex subject matter protocol, and a significant period of from four to six years had elapsed following his analysis in this case. *Cf. United States v. James*, 63 M.J. 217, 221 (C.A.A.F.2006)(subsequent misconduct occurring within a matter of days was relevant) and *United States v. Henry*, 48 C.M.R. 541, 543, 1974 WL 13853 (C.M.A.1974)(subsequent misconduct occurring reasonably contemporaneously with the crime charged outweighs the risk of undue prejudice).[10]

*Errors in Serology*

More germane to our review of this case is the "new" evidence about Mr. Mills' serology work. Though the USACIL report was focused on his work as a DNA examiner, it also included inquiry into Mr. Mills' forensic serology work. Second *DuBay* Hearing Record at 34. The report indicates that Mr. Mills' better-than-average productivity was due to rushing through cases, taking shortcuts in screening, and analyzing only a minimum of samples. This resulted in his missing stains of evidentiary value. He also inappropriately sampled evidence by removing entire stains, when that was not required by the size of an

---

10. While we question whether this evidence would be admissible, we need not resolve the issue, because we conclude that this information is so remote in time and subject matter that, if

presented to the court-martial, it would not "probably produce a substantially more favorable result for the accused." R.C.M. 1210(f)(2)(C).

insufficient sample. In doing so, he failed to comply with the protocol requiring retaining at least 50% of a sample, and he did not notify the originating agency when he consumed an entire sample. Additionally, he produced insufficient documentation. Finally, he retained remnant samples, though laboratory protocol required these be returned to the originating agency. Final Report, Mr. Phillip R. Mills, DNA Examiner's Misconduct, Issued By United States Army Criminal Investigative Laboratory's Quality Manager, Mr. Michael Auvdel of 30 September 2008 (Final USACIL Report); *see also* AE LXXIV at 52–55 (Draft USACIL Report).

Some of this information is not new. The fact that Mr. Mills sometimes failed to find relevant stains was a fact presented to the members. He failed to find amylase on the swab taken of the victim's penis, which ultimately yielded relevant DNA in this case. Also a matter of record at the time of trial was that he failed to produce adequate documentation. His examination of the swab was not well-documented, and he annotated that he reviewed some of the evidence before he signed the receipt for the evidence package on the chain of custody document. Defense Exhibits B, C; Prosecution Exhibits 16, 22–25, 30. The "new" evidence that Mr. Mills made similar errors in some other serology cases is, therefore, not a material matter, but one of cumulative impeachment. The serology discrepancies uncovered by the USACIL inquiry that are not cumulative, are merely impeachment material. They are not direct evidence of cross-contamination or falsification in this case.

There is also data in the USACIL report that reflects retesting of several of Mr. Mills' serological examinations resulted in findings at variance with his original findings. The report opines that reasonable explanations include that the passage of such a long period of time has affected the quality of the remaining samples, and that there has been increasing sophistication in the technology now used. Final USACIL Report at 23; Second *DuBay* Hearing Record at 69–70, 75. Regardless, if this new data were admissible, it would be admissible as impeachment. It relates to Mr. Mills' general lack of proficien-cy in identifying stains in other cases as only one of a number of possible explanations for the deviation in retest results. Most importantly, even if accepted at face value as evidence of an error by Mr. Mills, these results do not indicate "false positives" due to cross-contamination. They show only that Mr. Mills might have overlooked relevant stains—as he did in this case—or that he identified stains that subsequently were not verified as being present. They do not directly relate to any improper handling of evidence leading to cross-contamination in this or any other case in which he conducted the serology examination.

*Evidence of Cross–Contamination*

There is no direct evidence that cross-contamination occurred in this case. First *DuBay* Hearing Record at 5, Findings of Fact 38, 41, 43; Second *DuBay* Hearing Record at 4–5, Finding of Fact 20. At trial, Mr. Mills testified about the serological examination protocol, how he handled the evidence, and his findings. He specifically testified to having sterilized his scissors between cutting samples. Record at 798. He was subject to cross-examination on these matters, and he admitted that he did not find amylase on the penile swab, on which Mr. Price later found relevant DNA. *Id.* at 793–818. Neither the subsequent USACIL inquiry nor the findings of the *Dubay* military judges contain direct evidence of cross-contamination or falsification by Mr. Mills in the processing of evidence in this case.

Mr. Price, who conducted the DNA analysis, also testified at trial specifically about the potential for cross-contamination. He testified that if the source of DNA on the penile swab had been from cross-contamination with the control sample of the appellant's DNA, then he would expect the control sample to be contaminated by the swab. Record at 894–936. In other words, in the case of cross-contamination, he would have found a mixture of the appellant's and the victim's DNA on both the control sample and the swab; but, he did not. Mr. Price found only the appellant's DNA on the control sample. This indicated that there had been no contamination from the control sample to the penile swab. Record at 922–23. Neither the

USACIL investigation nor the *DuBay* facts question or criticize Mr. Price's proficiency in DNA analysis, and they do not contain any direct evidence that his findings and testimony in this case regarding cross-contamination are inaccurate.

*Combined Impeachment Evidence*

The general thrust of the appellant's argument is that all of the new evidence leads to the conclusion that Mr. Mills cannot be trusted and, if he cannot be trusted, the members would conclude cross-contamination is either likely, or at least could not be ruled out. We reject this argument for several reasons. First, it represents a flawed logical syllogism incorporating the fallacy of affirming the consequent. That syllogism is: 1) a forensic serology examiner who cross-contaminates samples did not follow the rules; 2) Mr. Mills did not follow the rules; so, 3) Mr. Mills cross-contaminated the samples. Even those not readily conversant in formal logic would perceive the fatal flaw inherent in this argument. We decline to accept it.

Second, the limited portion of the USACIL investigation addressing Mr. Mills' serological work yielded no direct evidence that he contaminated the evidence in this case. To the contrary, the direct evidence at trial included Mr. Price's testimony that, as part of his examination protocol, he specifically tested the samples submitted to him for cross-contamination and found none.

Third, the impeachment value of this additional information is not strong as it relates to the DNA developed by Mr. Price. Some of the "new" information is cumulative of the actual discrepancies that occurred in this case. Mr. Mills indeed failed to test for, or failed to find, amylase on the penile swab that subsequently yielded the relevant DNA. His inadequate notes and the apparently misdated chain of custody document were also available at the time of trial. The "new" information that he squirreled away remnant samples, and failed to file required reports when he consumed all of a sample, does not directly address his evidence handling as it relates to cross-contamination. The most germane newly discovered information about Mr. Mills' evidence handling is that he sometimes cut out an entire stain, rather than

only a portion. On balance, we do not believe this impeachment information would have so undercut the quality of the DNA evidence developed independently by Mr. Price as to "probably" produce a substantially more favorable result. *Harris,* 61 M.J. at 397. This is not only because the information is less probative and less material than that available and considered at trial, but also because Mr. Price represents an intervening quality control agent.

As already noted, Mr. Price requested the penile swabs, even though Mr. Mills testified he had found no relevant stain. Mr. Price specifically testified that, based on his testing of the appellant's control sample and the evidence, there was no cross-contamination. The appellant argues that Mr. Price's testimony did not establish that it is impossible to have had cross-contamination; and that the USACIL report and witnesses are unable to categorically eliminate the possibility of cross-contamination. But, such absolute propositions do not reflect the proper standard of proof beyond a reasonable doubt. "Proof beyond a reasonable doubt means proof to an evidentiary certainty, although not necessarily to an absolute or mathematical certainty." Military Judge's Benchbook, DA PAM 27–9, Ch 8, § III, ¶ 8–3; *see United States v. Loving,* 41 M.J. 213, 281 (C.A.A.F.1994). The DNA evidence developed by Mr. Price, viewed in the light of the "new" impeachment material against Mr. Mills, still meets the standard of proof to an evidentiary certainty, even if it fails to be absolutely or mathematically certain. We conclude, therefore, that the impeachment value of all of the newly discovered evidence is not sufficient to " 'make a more favorable result probable.' " *United States v. Brooks,* 49 M.J. 64, 69 (C.A.A.F.1998)(quoting R.C.M. 1210(f)(2)(C)). Even if the "new" evidence would so degrade confidence in the DNA evidence as to lead the members to disregard it, our conclusion remains the same based on the strength of the Government's case independent of the forensic evidence.

**D. Strength of the Government's Case**

The prosecution presented substantial evidence in support of its case against the ap-

pellant. First, the Government built a compelling case of motive and plan, if not *modus operandi*. Adult homosexual pornography was introduced into evidence from the appellant's computer. PE 13, 35. A series of witnesses testified to the appellant's pattern of inviting Marines to a wood-working shop over which he had control after working hours. The appellant, a gunnery sergeant, would sometimes first take the junior Marines, some of whom were underage, to a bar where he drank with them. At the bar and at the wood-working shop, the appellant engaged the junior Marines in sexual conversation, such as "If you don't quit stroking your [beer] bottle like that, I'm going to have to whip it out and you are going to have to stroke it." *Id.* at 423–27, 465–66, 527. The conversation at times included a game he called "Truth or Dare." *Id.* at 427, 467. The appellant would ask personal, sexually oriented questions, such as "[D]o you have what it takes to masturbate in front of a man?" *Id.* at 470. As part of the game, he would dare the young Marines to engage in provocative conduct, such as exposing themselves while still in the bar. *Id.* at 423, 467. At the workshop, the appellant would provide the underage Marines beer. At some point in the evening, the appellant would isolate a Marine, sometimes asking him to remain behind to sweep up after the others had gone. *Id.* at 1040, 1046, 1165. In this case, the appellant motioned to LCpl M that the appellant wanted to show him something in the bushes. *Id.* at 427. Once alone with a Marine, the appellant would again engage in sexually-oriented conversation or "Truth or Dare." Two Marines testified that, while alone with him, the appellant dared them to strip naked and stand on their heads. *Id.* at 1047, 1167. In the case under consideration here, LCpl M testified that once alone behind the bushes, the appellant asked him if wanted to play "Truth or Dare." When LCpl M indicated he did not understand, he testified that the appellant abruptly pulled LCpl M's pants down, fondled and sodomized him. *Id.* at 427–28.

Contrary to the appellant's assertion that this witness made a variety of inconsistent statements and was not worthy of belief, our reading of even the cold record revealed compelling and emotional testimony, and solid corroboration. One particularly relevant witness was LCpl Bond, who accompanied the appellant and LCpl M from the bar to the site of the assault. He testified that as the three approached the appellant's truck, the appellant and LCpl M walked past it and went behind some nearby bushes. *Id.* at 471. When they had been gone "about 10 minutes" LCpl Bond got out of the appellant's truck and approached the bushes, asking if everything was all right. The appellant told him yes, and LCpl Bond heard the distinctive sound of a military belt buckle being closed. *Id.* at 472. When the two emerged from the bushes, LCpl M appeared "extremely upset," very red in the face, flustered and crying. He said "That ain't right Gunny—I don't want to do that again." *Id.* LCpl M then remained silent for the duration of the drive to the barracks. *Id.* at 479. Once at the barracks, LCpl M got out of the appellant's truck "extremely upset, sir, crying, mumbling to himself." *Id.* at 478. He proceeded to the duty desk, where other witnesses testified that he was "distraught," crying, yelling, and that he blurted out that the appellant had forcibly sodomized him. Record at 503, 512–14, 557. On balance, the Government case against the appellant was compelling, exclusive of any corroborating forensic evidence.

The defense case, on the other hand, was not particularly strong. The appellant's defense strategy consisted primarily of counsel's cross-examination of the Government's witnesses, yet counsel was unable to identify significant contradictions or gaps in the witnesses' testimony. More importantly, the appellant was unable to develop a theory of why these disparate Marines would conspire to testify as they did. In his defense, the appellant presented good character witnesses.

After weighing the strength of the Government's case, the marginal nature of the defense case, and the limited probative value of the new impeachment evidence of Mr. Mills as it relates to Mr. Price's DNA testing, we conclude that the additional impeachment evidence regarding Mr. Mills would not have probably influenced the fact finder to render

a substantially more favorable result, even if they had completely disregarded the forensic evidence. *Harris,* 61 M.J. at 397; *United States v. Kerr,* 51 M.J. 401, 405 (C.A.A.F. 1999).

Independently reviewing all of the evidence in this case, including the facts developed by the *DuBay* hearings, we remain convinced of the reliability of the DNA analysis by Mr. Price. Even if we disregard this evidence, we are convinced that the appellant's guilt was proven by legal and competent evidence, beyond a reasonable doubt, and that he is, in fact, guilty of Charge IV, Specification 2.

Finally, we have also examined the issue of Mr. Mills' post-trial misconduct pursuant to our responsibility to approve only those findings that should be approved. Article 66(c), UCMJ. We conclude that Mr. Mills' misconduct is sufficiently remote from this case, both in time and in technical subject matter, that we decline to exercise our Article 66(c) authority to disapprove the findings of guilty to Charge IV, Specification 2.

E. Post–Trial Delay

█ The appellant asserts that he has been denied his right to the speedy post-trial processing of his case, due to the amount of time the Government has taken to complete the USACIL investigation. He further asserts that this has led to prejudice, because the forensic evidence in his case has been destroyed and is no longer available for retesting.

In light of *United States v. Allison,* 63 M.J. 365 (C.A.A.F.2006), we will assume, without deciding, that the appellant was denied his due process right to speedy post-trial review and appeal. However, based on the totality of the circumstances, we conclude that the appellant has not suffered any specific prejudice as a result of the delay. Primary among the circumstances is that the appellant has not prevailed on any meritorious issue that would require retrial. As a result, the appellant's ability to defend himself at such a retrial has not been compromised by the unavailability of the forensic evidence. Second, we again note that the appellant raised the potential for cross-con-

tamination at trial, whereupon Mr. Price testified that he specifically tested for cross-contamination and found none. Third, this record contains no direct evidence that contradicts Mr. Price's testimony or compromises the integrity of his DNA testing in this case. We conclude that any assertion or implication that the forensic evidence, if available for retesting, would lead to additional evidence favorable to the appellant is speculation. We, therefore, hold that any due process violation that may have occurred in processing this case was harmless beyond a reasonable doubt. *United States v. Allende,* 66 M.J. 142, 145 (C.A.A.F.2008).

We have also examined the issue of post-trial delay in this case pursuant to the authority contained in Article 66(c), UCMJ, the guidance in *Toohey v. United States,* 60 M.J. 100, 101–02 (C.A.A.F.2004); *United States v. Tardif,* 57 M.J. 219, 224 (C.A.A.F.2002); and the factors we articulated in *United States v. Brown,* 62 M.J. 602 (N.M.Ct.Crim.App. 2005)(*en banc*). Again, after examining the totality of circumstances, we conclude that the delay in completing our second review of this case was principally related to the time USACIL required to complete their inquiry. As is abundantly clear from the record, this was a complex, expensive and technically laborious undertaking. The process suffered from a number of setbacks, including unresponsive contractors and dereliction of duty by a supervisory staff member. Additionally, we have expressed concern about the apparent lack of forthright cooperation with the orders of the *DuBay* judges and of this court. However, while the second *DuBay* judge alluded to possibly "contemptuous" behavior, he made no finding of contempt. Second *DuBay* Hearing Record, Finding of Fact 36. We conclude on this record that USACIL had substantial motives to properly investigate this matter, and ultimately succeeded in doing so in good faith. As we are confident that the vigilance of the courts in enforcing their orders has allowed the appellant a full and fair opportunity to present his case on appeal, we conclude that the delay in this case has no affect on the findings and sentence that should be approved.

### F. Original Assignments of Error

We have reconsidered the appellant's original assignments of error, and we dispose of them in accordance with our prior decision. *United States v. Carlson,* No. 200100209, 2006 WL 416238, 2006 CCA LEXIS 27, unpublished op. (N.M.Ct.Crim.App. 14 Feb. 2006).

### Conclusion

Accordingly, we affirm the findings of guilty except for the charge previously dismissed, and the sentence, as previously reassessed.

Senior Judge COUCH and Judge MAKSYM concur.