# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
BURTON, HAGLER, and SCHASBERGER
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Colonel JAMES C. LAUGHREY**
**United States Army, Appellant**

ARMY 20160146

Headquarters, Military District of Washington
James W. Herring, Jr., Military Judge (*arraignment*)
Tyesha L. Smith, Military Judge (*trial*)
Colonel James R. Agar, II, Staff Judge Advocate (*pretrial*)
Colonel John P. Carrell, Staff Judge Advocate (*post-trial*)

For Appellant: Lieutenant Colonel Christopher D. Carrier, JA; William E. Cassara, Esquire (on brief); William E. Cassara, Esquire (on reply brief).

For Appellee: Colonel Tania M. Martin, JA; Lieutenant Colonel Eric K. Stafford, JA; Major Michael E. Korte, JA; Captain Meredith M Picard, JA (on brief).

2 July 2018

---------------------------------
MEMORANDUM OPINION
---------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

HAGLER, Judge:

A military judge sitting as a general court-martial convicted appellant, consistent with his pleas, of aggravated sexual abuse of a child, production and possession of child pornography, adultery, and conduct unbecoming an officer, in violation Articles 120, 134, and 133, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 934, 933. He was sentenced to a dismissal and confinement for eight years. The convening authority approved the adjudged sentence.

We review this case under Article 66, UCMJ. Appellant alleges two errors. First, the military judge's failure to explain the defense of lack of mental responsibility to appellant rendered his guilty pleas improvident. Second, his guilty plea to adultery was improvident, as the military judge failed to elicit an adequate factual basis to show his conduct was service-discrediting. We disagree.

## BACKGROUND

At the time of his court-martial in 2016, appellant had served nearly 28 years on active duty as a Military Intelligence officer. His marriage to his wife of 27 years, LL, produced two biological children: one daughter and one son.

When his daughter CL was about eleven years old, appellant began to engage with her in progressively sexual conduct. He challenged her to reveal her breasts and genitalia, both indoors and outdoors in secluded settings, and encouraged her by doing the same himself. He lay in bed with her, often when one or both were naked, and he fondled her breasts, bottom, and genitalia. He kissed her neck and breasts, and he ran his fingers around her labia.

CL recorded her father's abuses in a journal, which was admitted at trial as an attachment to the stipulation of fact.[1] "He told me early on, point blank, that it was child molestation," she wrote. As part of the "cuddling" sessions, appellant offered "sex education" to his daughter, demonstrating sexual positions with her and commenting on his own experience with anal sex. Appellant told CL that boys her age "don't know how to make it good for the girl." Once, he took her hand and moved it toward his pubic area, but she pulled her hand away. On a couple occasions, she noted that the tip of appellant's penis was wet and sticky, and once he wiped the fluid on her leg. "I was so scared of getting pregnant," she wrote, from the pre-ejaculate fluid he left on the sheets. Appellant assured her they were never going to have intercourse, "but will I try to give you an orgasm on the other hand? Maybe someday." "I'm sorry that I'm a weird parent," he offered in consolation.

Appellant took many digital photos of his nude daughter.[2] In several of them, CL is bent over or her legs are open, exposing her vagina. Appellant's apparently unclothed body can be seen in a number of these images, including two of the "sex education" shots, which portray a fully nude CL straddling appellant's bare waist. Others are close-up shots of her breasts and vagina. He assured his daughter he would delete the photos right after taking them, and he pretended to do so in front of her, but he did not. Instead, he kept the images for years until they were discovered

---

[1] Appellant stipulated to the admissibility of CL's journal entries and videos of her Criminal Investigation Division (CID) interviews, which were admitted for providency and sentencing.

[2] The stipulation of fact contains a description of each digital image and appellant's admission that CL was under age 18 in each. Appellant also stipulated to the admissibility of the images, which were admitted for providency and sentencing.

during the forensic examination of his computer and storage devices.[3]  In fact, one of the more lascivious poses was his laptop computer "wallpaper" for some time.

Appellant's wife, while unaware of sexual nature of these encounters, warned him more than once about what she saw as "concerning behaviors."[4]  She admonished him about lying in bed with his adolescent daughter, saying he "stepped over a line" and that it "looked really terrible."  Appellant angrily protested his innocence, saying he would "never do something so disgusting" and agreeing to stop.  Yet he continued to molest his daughter when his wife and son were away, and he asked CL not to tell her mother, as it would upset her.

Appellant's abuse of his daughter continued for about seven years, at the family's homes in Maryland and Pennsylvania, and also during several family trips.[5]  His action came to light in 2014, when CL was 20 years old.  While looking into the abuse allegations, CID investigators also uncovered extensive photographic and video evidence of appellant's sexual relationship with a married friend of the Laughrey family, Ms. SM.

Appellant's mental responsibility and capacity received considerable attention during pretrial proceedings and at trial.  On 11 June 2015, at defense request, the military judge ordered a R.C.M. 706 sanity board, which found appellant, at the time of the alleged offenses:  1) had no mental disease or defect; 2) did not meet criteria for a psychiatric diagnosis; and 3) was able to appreciate the nature, quality, and wrongfulness of his conduct.  The board also found appellant presently suffered from major depressive disorder, but he had the mental capacity to understand and cooperate in his defense.

Although appellant did not challenge the sanity board's findings, his civilian defense counsel [hereinafter CDC] did retain an expert in neuro-psychology, Dr. Nadia Webb, to review images of appellant's brain and conduct cognitive testing.  Dr. Webb gave extensive testimony on two occasions.  First, in support of a defense motion for continuance to further evaluate the impact of traumatic brain injury (TBI)

---

[3] Appellant stipulated to the admissibility of the CID Digital Forensic Examination report, which was admitted for providency and sentencing.

[4] Appellant stipulated to the admissibility of his wife's sworn statement to CID, which was admitted for providency and sentencing.

[5] The charges in this case properly reflect the creation of a specific child pornography offense under Article 134, UCMJ, which applies to conduct after 11 January 2012.  Appellant's production of child pornography prior to that date was properly charged as an assimilated federal offense under clause three.

on appellant's conduct.[6]  Second, she testified during the defense sentencing case. Each time, the CDC represented that Dr. Webb's testimony and involvement in the case were for mitigation only and not intended to raise a defense or to negate the specific intent element of any charge.[7]

In the motions hearing, Dr. Webb testified that appellant's brain showed a scattering of small lesions and global tissue atrophy, and that the CDC had asked her to evaluate how these conditions affected appellant's decision making, judgment, and impulse control.  While the CDC told the court he had no concerns about appellant's mental responsibility or capacity, he argued denying the delay would "impede [appellant's] ability to present a case in mitigation and extenuation. . . ." The CDC explained why he did not believe lack of mental responsibility [hereinafter LMR] was a legal defense:

> CDC:  The law has not caught up with brain science.  The only defense to these kinds of crimes is insanity – we've had an insanity [sic] board, and Colonel Laughrey is sane. However, I believe, in 5-10 decades, we're going to look back on moments like this and say, we were so short-sighted on how the brain works.  So, based on the law, based on case law and statutes and regulations, this is not a defense, and that's why I say, 'I don't believe so.'
>
> Military Judge:  Is it evidence that might negate specific intent?
>
> CDC:  It could, but I don't think we're going to get there in this case. . . . [T]he cumulative effect of [appellant's] traumatic brain injury has an impact on inhibitions . . . .  I need to understand how, if at all, it impacted [appellant's] conduct.  Not as a defense, but in mitigation.[8]

---

[6] The military judge had previously granted a defense-requested continuance, from October to December 2015, to allow appellant's evaluation for TBI and to determine if TBI affected his conduct.  CDC noted that request was "solely for the purpose of sentencing."  The military judge had also granted a continuance, from August to October 2015, to allow the recently retained CDC to prepare for trial.

[7] We do not suggest that counsel may be provident for an accused, but the CDC's repeated disclaimers of the lack of mental responsibility defense, in appellant's presence, support our conclusion that appellant was aware of the defense.

[8] At least ten times during the motions hearing, the CDC indicated that the purpose

(continued . . .)

After the military judge denied the continuance, appellant withdrew from his pretrial agreement, and trial was set for March 2016. On 16 February 2016, however, appellant entered a new pretrial agreement, and he pled guilty on 3 March 2016.

During the defense sentencing case, Dr. Webb testified as an expert witness about her cognitive testing of appellant and the condition of his brain. She related that clinical studies had shown an association between similar brain conditions and impulsivity, poor judgment, disinhibition, increased sex drive, and decreased "mate selectivity," while noting it is possible to treat these problems successfully. The military judge then explained the standard for the LMR defense under R.C.M. 916(k) and asked Dr. Webb if she believed it applied to appellant:

> Dr. Webb: I believe, from what I saw, that [appellant] appreciated that [his conduct] was wrong, but not the sense that it was potentially harmful to his daughter in the way that it was. I believe that---
>
> Military Judge: So he appreciated that it was wrong?
>
> Dr. Webb: I believe he appreciated it was wrong, but not the full import of what he was doing—the same way that people can sometimes appreciate something is frowned on, but I don't believe he fully appreciated the harm it would cause to him, to his family, to his daughter. . . ."

The military judge also explained to Dr. Webb the purpose of a sanity board and the questions it answers under R.C.M. 706, taking care to clarify the difference between mental responsibility and capacity to stand trial. She then asked Dr. Webb, "[K]nowing what you know about Colonel Laughrey, do you believe that he had a defense to his actions?" As part of a lengthy response, Dr. Webb opined, "Could he say, 'This is wrong?' Yes," but she believed his upbringing and brain condition

---

(. . . continued)
of appellant's requested continuance was to obtain mitigation evidence, that LMR was not a defense in Appellant's case, or that the evidence appellant sought would not raise the LMR defense or negate specific intent. The CDC noted, however, that because appellant had not yet entered pleas, he had a "duty to make sure [specific intent] remains in play," in the event an appellate court raised concerns about defense counsel's due diligence in this case.

resulted in a lack of "full empathy and appreciation for the wrongfulness of his actions."[9]

Immediately after Dr. Webb was excused and returned to the gallery, the military judge asked the CDC if he had explored the LMR defense with appellant.

> Military Judge:  Defense, I know that there was a sanity board conducted in this case.  Have you fully explored whether the accused had the mental capacity to commit the offenses?
>
> CDC:  We have explored those *ad nauseum*; we have discussed it frequently.  Dr. Webb's testimony, I don't believe it forms a basis for a defense of mental disease or defect, because she said that he did understand what he was doing was inappropriate, though he didn't understand how it might affect his daughter

The military judge then addressed appellant directly.

> Military Judge:  Colonel Laughrey, have your defense counsel discussed with you mental capacity and mental responsibility? Have they discussed those terms with you?
>
> COL Laughrey:  Yes, they have, Your Honor.
>
> Military Judge:  Do you agree with your defense counsel's assessment that the defense of insanity, or the defense of mental responsibility or mental capacity does not apply in your case?
>
> COL Laughrey:  I do agree with that, Your Honor.

## LAW AND DISCUSSION

Our superior court has explained the standard of review we apply in this case as follows:

> A military judge's decision to accept a guilty plea is reviewed for an abuse of discretion.  Pleas of guilty should not be set aside on appeal unless there is a substantial basis in law and fact for questioning the guilty

---

[9] Sentencing testimony addressed appellant's difficult family history, to include sexual abuse by an adult aunt when he was a teen.

>    plea. If an accused sets up matter inconsistent with the
>    plea at any time during the proceeding, the military judge
>    must either resolve the apparent inconsistency or reject the
>    plea. Once the military judge has accepted a plea as
>    provident and has entered findings based on it, an
>    appellate court will not reverse that finding and reject the
>    plea unless it finds a substantial conflict between the plea
>    and the accused's statements or other evidence of record.
>    A mere possibility of such a conflict is not a sufficient
>    basis to overturn the trial results.

*United States v. Shaw*, 64 M.J. 460, 462 (C.A.A.F. 2007) (internal citations and quotation marks omitted). This court considers the entire record when determining providency of a plea. *United States v. Redlinski* 58 M.J. 117, 119 (C.A.A.F. 2003).

### A. Lack of Mental Responsibility

Regarding the first assigned error, we initially consider whether Dr. Webb's expert testimony raised a matter inconsistent with appellant's guilty plea, and if so, whether the military judge resolved the matter appropriately. Then we examine the related, but separate question of providency: whether appellant understood the LMR defense and was aware that by pleading guilty he waived his right to raise it.

### 1. Dr. Webb's Sentencing Testimony

We recognize that "[t]he existence of an apparent and complete defense is necessarily inconsistent with a plea of guilty." *Shaw*, 64 M.J. at 462. In any guilty plea, the military judge has an affirmative duty to resolve an apparent inconsistency by conducting further inquiry. Article 45(a), UCMJ. This duty is heightened in cases where mental responsibility may be at issue. *See Shaw*, 64 M.J. at 465.[10] In the instant case, the military judge satisfied the obligation, first by ordering a R.C.M. 706 inquiry. Second, she clarified that Dr. Webb's testimony did not meet the legal standard for the LMR defense. Third, she confirmed that both appellant and his counsel were aware of the LMR defense and both appellant personally, and his counsel, believed the defense did not apply.

---

[10] "Once a statement by the accused raises the possibility that a defense may apply, the military judge has an affirmative obligation to resolve any apparent ambiguity or inconsistency by conducting further inquiry. If, upon such inquiry, it appears that the accused may have a defense of lack of mental responsibility. . . the military judge must determine whether to order psychological testing by a sanity board." (citing Article 45(a), UCMJ; R.C.M. 706(a); R.C.M. 916(k))).

We concur with appellant that Article 45, UCMJ, extends to all defense matters inconsistent with a guilty plea, not only those that come directly from an accused.[11]  Here, the source of the possible inconsistency was Dr. Webb.  After initially testifying about impulsivity and disinhibition, she ultimately opined that appellant understood his conduct was wrong, but he failed to fully appreciate the long-term consequences—the risk and extent of harm to himself, his family, and to his daughter. Even viewed in the light most favorable to the defense, Dr. Webb's opinion does not reasonably raise the elements of the LMR defense under R.C.M. 916(k).  At best, her initial testimony raised the "mere possibility" of the defense, but that possibility was negated by Dr. Webb herself, after the military judge apprised her of the legal standard.  After she opined that appellant appreciated his conduct was wrong,[12] there was no possible defense raised, and no potential inconsistency between her testimony and appellant's guilty plea.

Appellant argues the military judge should have done more, specifically by explaining the LMR defense to appellant and having him refute or disavow the facts supporting the defense.  But again, there remained no potential inconsistency or fact for appellant to disavow.  The situation might be different if appellant himself had testified to facts raising a defense or offered some other belief inconsistent with a guilty plea.  Certainly in cases where the accused's subjective belief is an element of a defense, the military judge should determine whether an accused holds or disavows the belief or facts at issue.[13]  In this case, there was no such issue.  There was only

---

[11] Appellant further argues the only way the military judge can resolve a potential inconsistency is to question the accused, citing *United States v. Harris*, 61 M.J. 391 (C.A.A.F. 2005).  Particularly on the facts of the instant case, we do not concur that an accused is the only person who can resolve a potential inconsistency or that he must personally refute or disavow testimony raising a possible defense, regardless of its source.

[12] One of the touchstones of Dr. Webb's testimony was that appellant lacked empathy, not mental capability.  Dr. Webb explained: "[T]he impairments that I saw were not on formal reasoning.  Could he say, 'This is wrong'?  Yes."  Dr. Webb had previously explained appellant had a diminished capacity to "have empathy, and fully appreciate what it might be like to be [his victim]."  Of course, a lack of empathy or failure to fully appreciate a victim's experience does not raise a defense.

[13] The examples cited by appellant raise similar issues:  the defenses of consent, justification, mistake of fact, or self-defense.  In such cases, if extrinsic evidence showed the accused held the requisite belief, then questioning the accused might be the only way to resolve the potential inconsistency.  *See, e.g. United States v. Thomas*, 45 M.J. 661, 665-66 (Army Ct. Crim. App. 1997).

Dr. Webb's initial testimony, and when she clarified her opinion, in light of the legal standard, it no longer raised even the possibility of a defense.

Taken as a whole, Dr. Webb's testimony strikes us as exactly what the CDC consistently told the court it was, throughout the case: mitigation evidence tending to lessen the punishment appellant might otherwise merit. In the end, there was no conflict between Dr. Webb's testimony and appellant's pleas.

### 2. Appellant's Understanding and Waiver of the LMR Defense

Next we turn to the related but separate question of providency—specifically, whether appellant understood the LMR defense and his right to raise it, and whether he made an informed decision to waive it by pleading guilty. We conclude he did.

Again, appellant argues the military judge should have done more to ensure appellant was provident, but let us review what she actually did. The military judge accepted appellant's guilty plea only after a thorough colloquy on the rights he was giving up by doing so. The military judge went through the pretrial agreement paragraph-by-paragraph with appellant, who assured her he understood its meaning and effect.[14] The military judge also discussed the stipulation of fact, to include its provision on mental responsibility.[15] During the defense sentencing case, the military judge explained the standard for the LMR defense to Dr. Webb and clarified that the witness' opinion did not raise the defense. Immediately afterward, the military judge questioned the CDC and appellant separately, and their responses left no doubt about their position: they had discussed the LMR defense, they believed it did not apply, and they did not intend to raise it.[16]

---

[14] In the pretrial agreement, appellant waived any motions to suppress unlawfully obtained evidence. The military judge confirmed that appellant understood he was giving up the right to make any other motion that, by law, was waived by his guilty plea.

[15] Paragraph VII of the Stipulation of Fact, reads, "STIPULATION AS TO MENTAL RESPONSIBILITY[.] During all the events referred to in this stipulation, [appellant] was competent. He has no legal excuse or justification for his actions." Appellant adopted the stipulation of fact and made several changes to it in court.

[16] Appellant's reply brief takes issue with CDC's description of the LMR defense during this colloquy with the military judge. Although his brief comments in that one instance failed to capture the defense fully and accurately, we find no reason to doubt the CDC understood the legal standard. The CDC spoke about mental responsibility and competency frequently on the record, often at length, and the record shows he had previously served as defense counsel in a court-martial where mental responsibility was a key issue.

Although the military judge did not reiterate the explanation she had just given to Dr. Webb, we conclude appellant understood the LMR defense. It was a recurring topic in pretrial motions and at trial, and appellant was present during these extensive discussions. Moreover, appellant participated in the sanity board, and given the number of times the results were discussed in court, we have no reason to suspect he was not aware of them and what they meant.

It is clear from the record that appellant sought to plead guilty, but at the same time, to offer expert testimony about his brain condition in mitigation. The record also shows appellant gained considerable benefit from his pretrial agreement. In addition to a sentence limitation, the convening authority agreed to dismiss a charge and several specifications, thereby reducing appellant's punitive exposure. Likewise, appellant received the benefit of his expert witness's mitigation testimony during sentencing.[17]

From all appearances, appellant took part in plea discussions and entered his guilty pleas with his eyes wide open. Throughout the trial, appellant was articulate and appeared engaged in the proceedings. There is no suggestion in the record that he was confused about his rights or did not know he was waiving them by pleading guilty. Appellant's and counsel's exchanges with the military judge occurred at times when he could have withdrawn from the pretrial agreement and asserted the LMR defense in a contested trial. Indeed, appellant's withdrawal from the first pretrial agreement after his continuance was denied shows that he understood these rights. In sum, we are convinced appellant knew what the LMR defense entailed, that he could raise it, and that he was voluntarily waiving his ability to do so by pleading guilty.

As a final point, we find no basis in fact to question appellant's mental responsibility, as his own words and deeds show he could, and actually did, appreciate what he was doing. He hid his abuse of his daughter for many years, and he took greater pains to do so after his wife confronted him. He falsely told his daughter he deleted the pornographic photos he took of her. He pursued his assignations with SM in secret. He apologized to his daughter for being a "weird parent," acknowledging the deviant and wrongful nature of his conduct. Lastly, appellant admitted during the providence inquiry and in the stipulation of fact that

---

[17] In the context of the LMR defense, we question whether it is in the interest of justice to reject a guilty plea, depriving an accused of such benefits and placing on him the burden to prove, by clear and convincing evidence, a defense he and counsel believe does not apply and which is strongly contradicted by the evidence. This seems a harsh result to impose on an accused who seeks to offer what may be the best mitigation evidence he has. While not necessary to resolve this case, we consider this question, just as trial judges must consider the interests of justice in exercising their discretion to accept or reject a guilty plea.

his conduct was wrong, why it was wrong, and that he could have avoided the conduct if he wanted. We are satisfied that appellant appreciated the nature, quality, and wrongfulness of his conduct at the time of the offense and thus, the military judge did not abuse her discretion in accepting appellant's guilty pleas.

*B. Appellant's Guilty Plea to Adultery*

On the second assigned error, we consider two questions. First, as a matter of law, must adultery be open and notorious to be service-discrediting? Second, did appellant's statements during providency and in the stipulation of fact provide a sufficient basis to find his conduct was, in fact, service-discrediting?

Appellant argues that by amending the *Manual for Courts-Martial* [*MCM*] in 2002, the President intended an especially strict definition of the "service-discrediting" element of adultery. Appellant further argues that adultery cannot be service discrediting unless it is "open *and* notorious" at the time of commission, suggesting that future discovery is insufficient to satisfy the element.

We look first to the Manual's explanation: "Discredit . . . *includes* adulterous conduct that has a *tendency*, because of its open *or* notorious nature, to bring the service into disrepute, make it subject to public ridicule, or lower it in public esteem." *MCM*, pt. IV, para. 62.c.(2) (2012 ed.) (emphasis added). Considering the emphasized words, we note that the President could have required adulterous conduct to be both open *and* notorious, as appellant suggests.[18] Instead of the non-exclusive "includes," the President could have stated discredit "is limited to," "includes only," or "comprises" adulterous conduct that is open or notorious. But as the President did not use these words, we are not inclined to read them as narrowly as appellant suggests.

We also note that the *MCM* directs commanders to consider "all relevant circumstances" to determine if adulterous conduct is prejudicial or service discrediting. Among the non-exclusive factors listed is "the flagrancy of the conduct, such as whether any notoriety *ensued*." *MCM*, pt. IV, para. 62.c.(2). This language plainly envisions notoriety arising after discovery, not just at the time of commission. Indeed, it would be difficult to describe even the most infamous crime as "notorious" if limited to the time it was known only to the culprits.

Given the plain text of the current Manual, we see no need to delve deeply into the drafter's intent or the scope of prior versions to reach a result in this case.

---

[18] Although appellant's counsel used the phrase "open and notorious" many times in their briefs, we find the military judge correctly advised appellant on the current language of para. 62.c.(2), *i.e.*, "open or notorious."

Adultery is not required to be both open *and* notorious; it may be either. Further, it need not have actually lowered the service in public esteem, but it must have *tended* to do so, even if discovered after the fact.

We find the military judge elicited a sufficient factual basis to support appellant's guilty plea to adultery. The military judge properly explained the offense, including the meaning of "service-discrediting conduct." Appellant said he understood the elements and definitions, and he admitted they accurately described what he did. He admitted to having sexual intercourse with SM, "a long-time family friend," who was married to TM at the time. He then explained why his conduct was service discrediting—because it "would degrade the opinion of the public as to the integrity of commissioned officers, and of their general view of the armed forces." Appellant admitted that, during the investigation, he told his wife and several in-laws of his adultery, and that TM also became aware of the affair. He agreed with the judge that society expects more of him as an Army officer, that his conduct would lower the military in the esteem of the public, and that he could have avoided committing adultery if he had wanted. In the stipulation of fact, appellant admitted his adultery was "not what civilians expect from service members let alone senior ranking officers."[19] We find these admissions were sufficient to establish the service-discrediting nature of appellant's conduct, and the military judge did not abuse her discretion in accepting his guilty plea to adultery.

## CONCLUSION

With the full benefit of hindsight, it is often possible to find less-than-perfect execution in a guilty plea—questions the military judge could have explored to exhaustion, or facts that might have been developed more thoroughly in the adversarial process of a contested trial. This case is no different, but it shows why the law gives substantial deference to the military judge in guilty plea cases. As our superior court has observed, although a more probing inquiry by the military judge might have resulted in a record "free even of arguable error," we find any questions raised by this record are not substantial enough to cast doubt on the providency of appellant's guilty plea. *United States v. Garcia*, 44 M.J. 496, 499 (C.A.A.F. 1996).

The findings of guilty and the sentence are AFFIRMED.

---

[19] Appellant also stipulated to the expected testimony of TM, which was admitted for both providency and sentencing. If called as a witness, TM would testify he had "strong suspicions" of his wife's affair with appellant, which was in part responsible for TM's divorce from SM. Also, TM would testify that his current knowledge of the affair "lowered his view of the military and especially of high ranking officers."

LAUGHREY—ARMY 20160146

Senior Judge BURTON and Judge SCHASBERGER concur.

FOR THE COURT:

JOHN P. TAITT
Acting Clerk of Court